# EXHIBIT B

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   *  *  *  *  *  *  *  *  *  *  *  *

 5   YOLANDA PEART,
         Plaintiff        *
 6
     STEIN MART, INC.,     *   NO. 09-7463
 7   and TRAVELERS
     PROPERTY CASUALTY
 8   COMPANY OF AMERICA,
         Intervenor       *   SECTION "S" (3)
 9
     VERSUS                *
10
     DOREL JUVENILE        *   Judge Mary Ann Vial
11   GROUP, INC.
     Lemmon
12       Defendant        *

13   *  *  *  *  *  *  *  *  *  *  *  *

14

15

16

17

18

19         Deposition of YOLANDA PEART, taken on

20   Wednesday, January 19, 2011, commencing at or

21   about 11:10 a.m., in the offices of Stanga &

22   Mustian, 3117 22nd Street, Suite 6, Metairie,

23   Louisiana 70002.

24

25
```

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

**Page 3**

```
 1   APPEARANCES:

 2

 3       Representing the Plaintiff:

 4       STANGA & MUSTIAN
         Attorneys-at-Law
 5       3117 22nd Street
         Suite 6
 6       Metairie, Louisiana 70002

 7       BY: WILLIAM R. MUSTIAN, III

 8

 9       Representing the Defendant:

10       SCHIFF HARDIN, LLP
         Attorneys-at-Law
11       6600 Sears Tower
         Chicago, Illinois 60606

12       BY: ANN H. MACDONALD

13

14   Reported by:   Barbara S. McGee
                    Certified Court Reporter
15                  State of Louisiana

16

17

18

19

20

21

22

23

24

25
```

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

**Page 2**

```
 1              I N D E X

 2

 3                              Page

 4

 5   Caption                     1

 6   Appearances                 3

 7   Agreement of Counsel        4

 8

 9   Examination

10     ANN H. MACDONALD          5

11     WILLIAM R. MUSTIAN, III   114

12

13   Witness' Attestation        116

14   Reporter's Certificate      117

15

16

17

18           *   *   *   *   *

19

20   Exhibits:

21     No. 1 (Copy of label on step stool)  75

22     No. 2 (History, physical & exam)     96

23

24

25
```

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

**Page 4**

```
 1              S T I P U L A T I O N

 2

 3       It is stipulated and agreed by and

 4   between counsel for the parties that the

 5   deposition of YOLANDA PEART, is hereby being

 6   taken under the Federal Rules of Civil Procedure

 7   for all purposes permitted under the law.

 8

 9       That the formalities of sealing and

10   certification are hereby waived.  The witness

11   reserves the right to read and sign the

12   deposition.  The party responsible for service

13   of the discovery material shall retain the

14   original.

15

16       All objections are to be made in

17   accordance with the Code of Civil Procedure.

18

19           *   *   *   *   *

20

21       Barbara S. McGee, Certified Court

22   Reporter in and for the State of Louisiana,

23   officiated in administering the oath to the

24   above-named witness.

25
```

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

57

1    Q.    Is that a different kind of back pain
2  than the back pain you were having --
3    A.    Well, it was actually -- the low back
4  pain was kind of -- I was told it was kind of
5  caused from the breasts being so large.  That's
6  why I had the chiropractic -- to see the
7  chiropractic when I was younger because my
8  breasts were so large.
9    Q.    But then you continued to see the
10  chiropractor even after your second surgery?
11    A.    Yes.
12    Q.    And that back pain was a result of the
13  previous issues with having large breasts?
14    A.    Well, that back pain actually -- I saw
15  that chiropractor after I had my son because I
16  was having pain afterwards.  Because during the
17  pregnancy it was bad.  But after I had him --
18  after I had him and with the accident it was
19  kind of -- it got real, real bad.  And then
20  after I had him he just had me go and just make
21  sure I use precaution.
22    Q.    Okay.  Have you ever had any serious
23  illnesses?  I know you have chronic sinus
24  problems.
25    A.    And I'm diabetic.

58

1    Q.    Diabetic.
2    A.    Type II diabetic.
3    Q.    Any other illnesses?
4    A.    No.
5    Q.    At the time of your accident were you
6  on any medications?
7    A.    I was taking Metformin.
8    Q.    What was that for?
9    A.    Diabetes.
10    Q.    Do you smoke?
11    A.    No.
12    Q.    Are there any other past health issues
13  that you think we've missed here?
14    A.    No, I think we've covered it.
15    Q.    Going back then to when you started at
16  Stein Mart you said that you had kind of just
17  started your training at that time?
18    A.    Yes.
19    Q.    And you had been trained on the cash
20  register?
21    A.    Yes.
22    Q.    Had you been trained on anything else?
23    A.    No.  I was told to walk the floors and
24  kind of hang up clothes but that wasn't really a
25  training.

59

1    Q.    Just kind of tell you go out there and
2  hang stuff up?
3    A.    Yes, yeah.
4    Q.    Can you describe -- just so I can
5  understand.  I've never been to a Stein Mart.
6  Is it one floor, two stories?
7    A.    It's one floor.  This particular one is
8  one floor.  And it's just one department -- it's
9  a department store.
10    Q.    And are the shelves in the store like
11  so high you can't see over them or can you see
12  over all of the shelves?
13    A.    You can -- I'm trying to remember.  I
14  believe you can see over the shelves.
15    Q.    Yeah?
16    A.    Yeah.
17    Q.    So if you're in one corner you can kind
18  of see what's going on in another corner?
19    A.    Uh-huh (affirmative response).
20    Q.    Do you remember who your supervisor was
21  at that time?
22    A.    No, I don't.  I remember his name was
23  Steve but I don't remember anything else.
24    Q.    And at the time that you were -- had
25  the accident with the step stool what were

60

1  you -- what tasks were you performing?
2    A.    I was putting up the overstock of
3  purses.
4    Q.    Was that the first time you had done
5  that?
6    A.    Yes.
7    Q.    Other than working the cash register,
8  walking the floors, picking up clothes, doing
9  overstock did you have any other duties?
10    A.    No.
11    Q.    Okay.  Did you ever -- were you ever
12  just told:  Hey, can you go do, you know, take
13  out the trash or go move some boxes around or
14  does that pretty much cover what you had done at
15  Stein Mart that day?
16    A.    Yeah, that's basically at the time all
17  I would do.
18    Q.    And were you shown how to use the step
19  stool and how to over -- or were you shown how
20  to use the step stool?
21    A.    No.
22    Q.    Were you shown how to stock the purses?
23    A.    Yes.
24    Q.    What did they tell you?
25    A.    Basically they already had some up so I

**61**

1    just followed the -- I followed the pattern that
2    they had, you know, had them stocked up there.
3        Q.    Had someone else been doing it before
4    you took over?
5        A.    **I don't know.**
6        Q.    You don't remember?
7        A.    **No, because no one else was doing it**
8    **that morning.**
9        Q.    So what time did you go to work?
10       A.    **7:00 that morning.**
11       Q.    What time did you get up that morning?
12       A.    **Probably around 6:00.**
13       Q.    Do you remember what you did the day
14   before the accident?
15       A.    **I worked at Stein Mart.**
16       Q.    How long did you work?
17       A.    **It was probably about four or five**
18   **hours that day.**
19       Q.    Morning, afternoon?
20       A.    **It was afternoon.**
21       Q.    What did you do after work?
22       A.    **I went to my grandmother's house.**
23       Q.    Did you go out after you went home?
24       A.    **I had -- my son was with me during that**
25   **time so most likely I would have spent the day**

**62**

1    with him.
2        Q.    Okay.  Do you remember if you went out
3    that night at all?
4        A.    **No.**
5        Q.    The night before?
6        A.    **No.**
7        Q.    So you woke up at 6:00 a.m.  What did
8    you do before you went to work?
9        A.    **Got dressed, ate breakfast.**
10       Q.    Were you -- were you usually scheduled
11   to come in at 7:00 a.m. or did you come in early
12   that day?
13       A.    **I came in early that day.**
14       Q.    Why did you come in early?
15       A.    **I'm not sure of his name, but Tim**
16   **sticks out.  He asked me to come in at 7:00 that**
17   **morning because I was stocking -- I was stocking**
18   **a purse on the shelf the day before so he asked**
19   **me to come in early to put up the overstock.**
20       Q.    So you had been stocking purses the day
21   before?
22       A.    **Uh-huh (affirmative response).**
23       Q.    Using the step stool?
24       A.    **No.**
25       Q.    Just --

**63**

1        A.    **On the floor.**
2        Q.    On the floor, putting purses up?
3        A.    **On the little hangers, yeah.**
4        Q.    So did he ask you to come in early the
5    night before?
6        A.    **Yes.**
7        Q.    Were you feeling tired working the day
8    before and then going in the next morning?
9        A.    **No.  They closed at 9:00 so it wasn't**
10   **anything late.**
11       Q.    So you went home at 9:00 or 9:30?
12       A.    **Actually I don't remember what time I**
13   **went home that day.**
14       Q.    Was the store open or closed at 7:00 in
15   the morning.
16       A.    **It was closed.**
17       Q.    It was closed.  Who else was in the
18   store?
19       A.    **I remember my manager, the supervisor**
20   **at the time.**
21       Q.    Tim?
22       A.    **Tim.  And it was another person**
23   **upstairs, the one who gave me the stepladder.**
24       Q.    Was that -- do you remember his or her
25   name?

**64**

1        A.    **I believe it's Betty.**
2        Q.    Betty?  You said upstairs.  Are there
3    two levels?  I thought you said there was one.
4        A.    **There's one level for shopping.  The**
5    **other level is for stocking everything.  So I**
6    **was upstairs.**
7        Q.    So what happened?  Can you kind of just
8    describe to me what happened?  Did you get to
9    work?
10       A.    **I get to work.  I check in.  I go**
11   **upstairs.**
12       Q.    Check in with who?
13       A.    **I check in with the time clock where**
14   **you have to punch in and everything.  And then I**
15   **go upstairs to where they showed me the night**
16   **before where the purses was going to be**
17   **overstocked.  And then I start to try to put the**
18   **purses, you know, by -- you know the same brand**
19   **together so I can put it on a shelf in the same**
20   **area where it was.  Then I started putting on a**
21   **lower shelf, the one that I can reach, I started**
22   **putting purses up.  So Betty, she comes in and**
23   **she said, "Oh, here's a stepladder."  And she**
24   **gave me the stepladder to use.  And so I started**
25   **using a stepladder for the second and the third**

65

1   shelf.
2       Q.   Who told you the night before that you
3   were going to come and do the overstock?
4       A.   **Tim when he asked me to come in and do**
5   **it that next morning.**
6       Q.   Did he give you any instructions when
7   he told you to do the overstock or did you just
8   know what he meant?
9       A.   **He gave me instructions on what to do**
10  **and where I had to put them and where they were**
11  **going to be.**
12      Q.   Did he tell you you might need a step
13  stool to use?
14      A.   **We didn't talk about a step stool.**
15      Q.   And when you were getting the purses
16  out you said that you were putting them by
17  manufacturer or by designer --
18      A.   **Yeah.**
19      Q.   -- together?
20      A.   **Uh-huh (affirmative response).**
21      Q.   Is that organize -- you're doing that
22  on the floor?
23      A.   **Yeah.**
24      Q.   You're taking them out of the boxes?
25      A.   **It was actually in a bin. It was one**

66

1   **big bin. Because when I was taking old purses**
2   **off -- when I was stocking the day before I was**
3   **taking old purses off and replacing them with**
4   **newer purses. So they had the old purses in the**
5   **bin and then they had the ones that was**
6   **overstocked in the bin as well. So I was taking**
7   **them out and organizing them so I could put them**
8   **on the shelf.**
9       Q.   Okay. Other than Betty was Tim in that
10  morning?
11      A.   **Yes, he was.**
12      Q.   So Betty and Tim. Was anyone else in
13  the store?
14      A.   **I'm not sure.**
15      Q.   So when Betty gives you the step stool
16  did she say anything to you?
17      A.   **No, she just gave me the step stool to**
18  **use.**
19      Q.   And was it unfolded or was it folded
20  up? Was she carrying it?
21      A.   **It was folded when she gave it to me.**
22      Q.   And was she carrying -- did she carry
23  it over to you?
24      A.   **Yeah, she carried it over to me.**
25      Q.   And what did you do when she handed it

67

1   to you?
2       A.   **I opened it and put it on the floor.**
3       Q.   You set it up?
4       A.   **Uh-huh (affirmative response).**
5       Q.   In the stock room are there rows of
6   shelves?
7       A.   **Yes.**
8       Q.   And you're working in between two rows
9   of shelves?
10      A.   **At the time when I fell I was working**
11  **in between two rows of shelves.**
12      Q.   How wide, how much space was there
13  between?
14      A.   **When I first started it was one whole**
15  **wall of purses. It was just almost like if we**
16  **were in this room right here had the whole wall**
17  **of purses. So I started on the left side and**
18  **just worked down. You know, I just worked down**
19  **from there. So when I first started it was**
20  **open. And as I moved further down it kind of**
21  **closed up because they had shelves behind on the**
22  **next wall behind me as I moved down.**
23      Q.   So when in the course of doing the
24  stocking did you have the accident? Had you
25  been using the step stool for a while?

68

1       A.   **I had been using it. I stepped on it a**
2   **few times before it broke.**
3       Q.   And did you have to move it and set it
4   up?
5       A.   **Yes.**
6       Q.   And if we're looking at the step stool
7   there you see the -- you step onto it on one
8   side and then you have kind of the handle is
9   kind of on the backside. Was the handle
10  pointing towards the shelf that you were putting
11  things on?
12      A.   **Yes.**
13      Q.   And about how far do you think the
14  handle was from the shelves that you were -- was
15  it right up against it?
16      A.   **Well, it would have been right up**
17  **against it because I'm not a big fan of heights.**
18  **So I wouldn't have -- I would put it close. I'm**
19  **not sure exactly where but I wouldn't have had**
20  **it far back for me to reach because I'm afraid**
21  **of falling, you know, for the thing tilting**
22  **forward.**
23      Q.   So it wasn't like you had to reach
24  forward?
25      A.   **Yeah.**

69

1    Q.   Were you reaching over?

2    A.   I was reaching directly up. So I had

3 it close enough so I could just reach and kind

4 of like, you know, move forward just to move it

5 into the space.

6    Q.   Okay. And you had a bin of purses

7 there --

8    A.   Yes.

9    Q.   -- next to you?

10    A.   Uh-huh (affirmative response).

11    Q.   Were you going up and down the step

12 stool, getting the purses and bringing them up?

13    A.   Yes.

14    Q.   So you weren't reaching from the step

15 stool into the bin?

16    A.   No.

17    Q.   About how many purses were you carrying

18 at a time?

19    A.   It depends on how many it was in that

20 same style that I could get in my hand. So I'm

21 not sure.

22    Q.   Depending on how big or --

23    A.   Yeah.

24    Q.   You don't remember how big it was when

25 you fell?

70

1    A.   It was a variety of purses that I was

2 dealing with that day.

3    Q.   When Betty gave you the stool did she

4 say anything -- she didn't say anything about

5 it?

6    A.   No.

7    Q.   Do you know if she inspected the stool

8 or looked it over or anything?

9    A.   No.

10    Q.   Do you know if she read any of the

11 stickers or labels that are on it?

12    A.   No.

13    Q.   Did you inspect it?

14    A.   No, I didn't inspect it. The only

15 thing I did was open it. And when I saw that it

16 was sturdy I used it.

17    Q.   How did you see that it was sturdy?

18    A.   It didn't shake. When I put it down it

19 didn't like shake or anything when I touched --

20 you know, when I put -- when I opened it and

21 placed it, it didn't shake. So for me that was

22 sturdy. So then I used it.

23    Q.   Okay. Now you just reached over there.

24 Will you reach over again. And you kind of were

25 able to wobble it a little?

71

1    A.   No, I wasn't able to do that. This is

2 shaking because this is loose.

3    Q.   Okay. So it wasn't shaky at all?

4    A.   Unh-unh (negative response).

5    Q.   It wasn't wobbly at all when you used

6 it?

7    A.   No.

8    Q.   It was not shaking?

9    A.   No, it wasn't shaking.

10    Q.   If it was shaking would you have gotten

11 on the step stool?

12    A.   No.

13    Q.   If it was at all wobbly would you have

14 gotten on the step stool?

15    A.   No.

16    Q.   You don't want to climb rickety --

17    A.   No, no.

18    Q.   Did you look at the stickers that are

19 on the step stool?

20    A.   No, I didn't.

21    Q.   You didn't? So you didn't read the

22 labels there?

23    A.   No.

24    Q.   Okay. And so when you said that it

25 wasn't shaky, you -- did you touch the handle at

72

1 the top or did you push your hand on the step?

2    A.   When I opened it -- when I open it I'm

3 holding the top and just kind of move it around

4 a little bit. And so -- and then I went from

5 there.

6    Q.   You didn't bend over and like inspect

7 the step?

8    A.   No.

9    Q.   Or the rivet or something?

10    A.   No.

11    Q.   Did you just assume that they would

12 give you a safe step stool?

13    A.   Yes.

14    Q.   You thought that if your employer gave

15 you the step stool to use it would be safe --

16    A.   Yes.

17    Q.   -- to do your job?

18    A.   I can't say that because I checked it.

19 If they would have gave me the step stool and it

20 would have been shaky I wouldn't have used it.

21 So I didn't have the expectation because it's my

22 employer they gave me a safe -- you know, a safe

23 step stool. I took it as they gave me a safe

24 stool, I went and when I opened it it wasn't

25 shaky, it wasn't wobbly. So now I can use it.

73

1   That's the mind set that I had about the step
2   stool.  I didn't think of them giving me any --
3   you know, I didn't think of it as my employer
4   gave me a safe step stool so I'll use it.  I
5   didn't rely on them to let me know the safety of
6   the step stool.
7       Q.    Okay.  So if we look at the step stool
8   now you can see that that bottom step is not
9   attached to one of the legs.  Do you know
10  whether it was attached when you got on it?
11      A.    It was attached.
12      Q.    It was attached.  And I'm assuming that
13  those metal strips that hold the step, were they
14  bent --
15      A.    No.
16      Q.    -- before the accident?
17      A.    I didn't notice anything bent.
18      Q.    Didn't notice anything bent.  Okay.
19  Other than that do you see anything else on the
20  stool today that was different about the stool
21  before the accident or after it?
22      A.    Only thing I noticed now is that this
23  is hanging.
24      Q.    Okay.  Do you think if you had done a
25  better job inspecting the stool you would have

74

1   been able to prevent it from breaking or you
2   from falling?
3           MR. MUSTIAN:
4               Objection to the form.
5               You can answer.
6   EXAMINATION BY MS. MACDONALD:
7       Q.    Do you think that if you had looked at
8   the stool more carefully that you still would
9   have had your accident?
10          MR. MUSTIAN:
11              Objection to the form, calls for
12  speculation.
13              Answer if you can.
14  EXAMINATION BY MS. MACDONALD:
15      Q.    Ma'am, I'm not asking you to speculate.
16  If you have a --
17          MR. MUSTIAN:
18              You actually are.
19  EXAMINATION BY MS. MACDONALD:
20      Q.    If you have a pretty good idea about
21  what could have helped you or not.
22      A.    No, I don't know what would have
23  happened.  I don't know how it would have ended
24  any differently, honestly.  Because all I did,
25  you know, I opened the step stool the way I

75

1   would normally open a step stool and I used it
2   because I felt that it was sturdy to use at the
3   time.
4           MS. MACDONALD:
5               Can you mark this as Exhibit 1,
6   please.
7               (Court reporter complies.)
8   EXAMINATION BY MS. MACDONALD:
9       Q.    Ms. Peart, can you take a look at that.
10  I'm going to tell you that what that is is just
11  a picture of the sticker that's on the step
12  stool right there.  It's just blown up for you.
13      A.    Okay.
14      Q.    Do you see what I'm talking about?
15      A.    This right here?
16      Q.    Uh-huh (affirmative response).  On it
17  it says working light household duty rating.  Do
18  you see that?
19      A.    I see light house and then I see duty
20  and R-T and a G.
21      Q.    Okay.  And after that line what does it
22  say?
23      A.    "Working load 200 pounds."
24      Q.    Okay.  Did you read that part of the
25  label before you got on the stool?

76

1       A.    No.
2       Q.    If you had read that part of the label
3   would you have gotten on the stool?
4       A.    No.  I would have questioned it.
5       Q.    Why would you have questioned it?
6       A.    Because it's saying working load 200
7   pounds.  I weigh over 200 pounds and I was going
8   to be carrying purses.
9       Q.    Do you have any idea how heavy the
10  purses were that you were carrying?
11      A.    It varied because it's various styles.
12      Q.    Okay.
13          MR. MUSTIAN:
14              I'd just like to note for the
15  record that this is blown up about probably 100
16  times bigger than it actually is, Exhibit 1.
17  EXAMINATION BY MS. MACDONALD:
18      Q.    All right.  Going back to how you were
19  using the step stool when you had the accident,
20  about how many times do you think you went up
21  and down before the time that you went on it and
22  it broke?
23      A.    I'm not sure.
24      Q.    Do you think it was more than five,
25  less than five?

77

1    A.    I'm not sure because I went -- I went
2    from one side down, so it could have been -- I
3    don't know how many times I went up and down.  I
4    was just working at the time, so I wasn't paying
5    attention to how many times I went up and down
6    on the step stool.
7        Q.    Was it at least 3?
8        A.    I could have been on that thing three
9    or more times.
10       Q.    Okay.  And so were you going up the
11   step stool when the step broke?
12       A.    Yes.
13       Q.    And what were you -- were you carrying
14   purses in your hands?
15       A.    Yes.
16       Q.    Did you have -- how many feet did you
17   have on the step stool?
18       A.    I had my right foot on this bottom step
19   and I was going up to this next step with my
20   left foot when the bottom broke.
21       Q.    So you had your right foot on the
22   bottom step and then your left foot was in the
23   air?
24       A.    Yeah, because I was stepping up to go
25   on the next step.

78

1        Q.    So you weren't holding onto the handle
2    or holding onto a shelf, your arms were full of
3    purses?
4        A.    I was only carrying the purses in one
5    arm.
6        Q.    In one arm.  Which arm?
7        A.    I was carrying them on my left arm.
8        Q.    And what were you doing with your right
9    arm?
10       A.    My right arm I was reaching on the top.
11       Q.    Holding onto the top of the handle?
12       A.    Uh-huh (affirmative response).
13       Q.    And what happened next?
14       A.    I got off the floor.
15       Q.    Do you remember how you fell?
16       A.    I remember reaching up to put the
17   purses up with my left hand and then the next
18   thing you know I was getting up off the floor.
19       Q.    Do you remember what part of your body
20   hit something?
21       A.    My -- it was my left -- I know my left
22   shoulder was hit.  I don't know by what but I
23   know my left shoulder was hit.  And I know that
24   I had a bunch of purses around me.
25       Q.    Was the area that you were in wide

79

1    enough that you could have fallen just to the
2    floor or do you think you hit something else?
3        A.    I hit the shelf because the way it went
4    is I fell, the shelves are in an L shape when I
5    fell.  So the shelf behind me it must have hit.
6    I'm not sure if the shelf reached out and did
7    something -- and I'm not trying to be funny.
8    But I know that I hit -- something hit my
9    shoulder and there was nothing else but the
10   shelves that was there when I fell.  And so the
11   next thing you know, you know, I was getting up
12   off the floor.
13       Q.    Okay.  What happened to the step stool
14   when you fell?
15       A.    I'm not sure.  I was immediately taken
16   downstairs to the break room.  And then I went
17   to the clinic afterwards.
18       Q.    And did the step stool fall over, do
19   you know?
20       A.    No, it didn't fall over.
21       Q.    So the step stool remained standing
22   like that?
23       A.    Uh-huh (affirmative response).
24       Q.    Did your -- did any part of your body
25   touch the step stool as you fell?

80

1        A.    I'm not sure.
2        Q.    Do you remember where your legs were
3    after you fell?
4        A.    On the floor.
5        Q.    Both of them?
6        A.    Uh-huh (affirmative response).
7        Q.    Did you hear anything as you fell?
8        A.    I heard me hollering and getting up off
9    the floor.  That's all I -- and I heard Betty.
10   Betty was like, "Oh, my God."  I heard her.  So
11   that's all I heard.
12       Q.    Do you know if Betty saw you?
13       A.    I'm not sure if she saw me but I know
14   she came over to help me get off the floor.  So
15   I don't know if she heard anything or if she saw
16   anything.
17       Q.    Did you talk to Betty about --
18       A.    No.
19       Q.    -- your fall?  After you fell did you
20   get up off the floor yourself?
21       A.    I had help from her to get off the
22   floor.
23       Q.    How did she help you?
24       A.    I'm not sure.  All I know she was there
25   when I was getting up.  I'm not sure if she

81

1  grabbed me or anything.  But I remember being on
2  my right knee using my right arm to kind of help
3  get myself up off the floor was well.
4      Q.    Okay.  So you're kind of on the floor
5  and you kind of roll over to the right, push
6  yourself up and Betty is there helping you?
7      A.    Uh-huh (affirmative response).
8      Q.    Okay.  And then what did you do next?
9      A.    I was taken down to the break room,
10  then I went to the hospital -- to the clinic,
11  actually.
12      Q.    And did you have to walk down the
13  stairs to go to the break room?
14      A.    There's a makeshift elevator that they
15  have there.
16      Q.    And did you ask to go to the hospital
17  or did --
18      A.    Well, they asked me if I was ready to
19  go back to work.  And, no, because I wanted to
20  go to the hospital because I was experiencing a
21  lot of pain.
22      Q.    What was hurting?
23      A.    My main concern was my hand at the time
24  because my hand was to the point where I
25  couldn't put it down.  So it was hurting like so

82

1  bad that I couldn't reach down to do anything.
2  So I held it up like this kind of babying my
3  arm -- you know, my hand and my arm because I
4  had, you know, all of this going on.  So I just
5  went there to the thing afterwards.
6      Q.    Which hand?
7      A.    My right -- my left hand.
8      Q.    Your left hand.  Was that -- did any
9  other part of your body hurt when you fell?
10      A.    Yeah, I had problems with my neck, my
11  shoulder and my upper back around the shoulder
12  blade, that area was hurting me.
13      Q.    Right after the accident?
14      A.    Yeah.
15      Q.    Do you remember anyone else being
16  around in the break room or after your accident?
17      A.    People were coming into work.  So when
18  I was in the break room, you know, people were
19  coming in to punch in.
20      Q.    Do you remember who any of those people
21  were?
22      A.    No.
23      Q.    Do you know what happened to the step
24  stool when you went to the hospital?
25      A.    No.  I didn't know what happened to the

83

1  step stool at all.
2      Q.    Do you know how your lawyer or the
3  workers' comp people got the step stool?
4      A.    No.
5      Q.    Do you know if anyone took pictures of
6  the step stool the day of the accident?
7      A.    No.
8      Q.    Had you ever seen the step stool before
9  the day of the accident?
10      A.    No.
11      Q.    You had never seen anyone using it?
12      A.    No.
13      Q.    Do you have any idea where it was
14  stored?
15      A.    No.
16      Q.    Do you know how old it was?
17      A.    No.
18      Q.    Do you know how often people used it?
19      A.    No.
20      Q.    Have you ever used a similar step stool
21  before the accident?
22      A.    I've used step stools before.  I
23  wouldn't -- I wouldn't know if they're similar
24  to this one or not.
25      Q.    But again you wouldn't have used any

84

1  kind of step stool if it was shaky?
2      A.    No, not at all.
3      Q.    Do you think that my client did
4  something wrong with the step stool that caused
5  your accident?
6          MR. MUSTIAN:
7              Object to the form, calls for an
8  expert opinion.
9              Answer if you can.
10          THE WITNESS:
11              I don't know.
12  EXAMINATION BY MS. MACDONALD:
13      Q.    You don't know?
14      A.    Unh-unh (negative response).
15      Q.    Is there any information about the step
16  stool that you would have liked before you used
17  it?
18      A.    I wouldn't have questioned it.  A step
19  stool to me is a step stool.
20      Q.    It wouldn't matter what was written on
21  it?
22      A.    It matters if something was going to
23  say that this could kill you, yeah, it would
24  have mattered.  Yeah, it matters what was
25  written on it, you know.  But I would have been

85

1  able to see -- it would have been nice if I
2  would have been able to see it.
3       Q.     Okay. So you mentioned before that
4  your neck, shoulder arm, hand were bothering
5  you?
6       A.     Uh-huh (affirmative response). And my
7  back around the shoulder blade area.
8       Q.     Okay. Did you have any -- we talked a
9  little bit before about you had back issues.
10      A.     Uh-huh (affirmative response).
11      Q.     Had you ever had any shoulder or arm
12 issues before this accident?
13      A.     No, I hadn't had any shoulder or arm
14 issues. Shoulder -- I would say shoulder
15 issues, I always had tense shoulders. Like I
16 always had tension in my shoulders but that's as
17 far as it went. But I hadn't had any arm issues
18 at all.
19      Q.     Did you see a doctor at the emergency
20 room?
21      A.     I didn't go to the emergency room.
22      Q.     Where did you go?
23      A.     I went to a clinic, the Concentra
24 clinic and I did see a doctor.
25      Q.     Who did you see?

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

86

1       A.     I don't remember.
2       Q.     And this was on the day of the
3  accident?
4       A.     Yes.
5       Q.     Do you remember what they told you?
6       A.     I was -- I remember getting x-rays done
7  and I remember being put in a hand little
8  thingamajig and being scheduled for physical
9  therapy. Taking off the rest of the day, come
10 back on Monday and then being scheduled for
11 physical therapy.
12      Q.     When you say hand thingamajig do you
13 mean like a sling?
14      A.     Like a little sling. And then I had --
15 I had a sling for my arm and then I had a wrist
16 that I can't think of what that thing is, little
17 wrist guard.
18      Q.     Brace?
19      A.     Yeah, brace. I'm sorry.
20      Q.     So they told you just to rest and come
21 back --
22      A.     On Monday.
23      Q.     -- on Monday?
24      A.     Yes.
25      Q.     Okay. Did they say you had broken

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

87

1  anything?
2       A.     No, nothing was broken.
3       Q.     Were you bleeding at all?
4       A.     No.
5       Q.     And so you came back on Monday and what
6  did you -- did you go back to the doctor on
7  Monday?
8       A.     Yes.
9       Q.     And what did you do at the doctor on
10 Monday?
11      A.     Went to go see what she said. And then
12 the physical therapist was available that day so
13 they sent me to the physical therapist that day.
14      Q.     And what did the doctor say about your
15 injuries on that day?
16      A.     She told me that I can go back to work.
17      Q.     Did she tell you anything else?
18      A.     No.
19      Q.     Did you get physical therapy on that
20 day?
21      A.     Yes.
22      Q.     What kind of therapy?
23      A.     She tried some type of hand that was
24 that parfait (sic) type of thing where I put my
25 hand in hot wax. And she gave me some

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

88

1  stimulazation (sic) for my neck and my back, and
2  she gave me a patch to put on.
3       Q.     What kind of patch?
4       A.     A pain patch.
5       Q.     And how were your shoulder and arm and
6  neck feeling at that time?
7       A.     It was uncomfortable because the
8  stimulazation it was just that stinging feeling
9  that I had and then she had to put ice on
10 something. I remember getting ice on something.
11 And I remember when she put my hand in the hot
12 wax I could have punched her. That's what I
13 remember.
14      Q.     Why?
15      A.     Because it burned like hell and it hurt
16 real bad.
17      Q.     Could you move your arm around on that
18 day?
19      A.     I've been able to move my arm around,
20 it hurts. It always hurt. I wasn't immobile
21 but I just had a lot of pain.
22      Q.     You were able to do everything that you
23 usually did it just hurt?
24      A.     Yeah. You know what, I wasn't able to
25 type because I couldn't use my computer -- I

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

89

1   remember that -- from my hand. I was in school
2   and I couldn't use my computer for class. So I
3   wasn't able to type with my left hand at that
4   time.
5     Q.   What classes were you taking then?
6     A.   **Psychology.**
7     Q.   Where?
8     A.   **At Argosy University.**
9     Q.   Argosy?
10     A.   **Uh-huh (affirmative response).**
11     Q.   How long had you been taking those
12   classes?
13     A.   **I had just started in December.**
14     Q.   December of?
15     A.   **I'm fibbing. I started October,**
16   **October 15th was my start date.**
17     Q.   Okay. Did you get any kind of degree
18   from Argosy?
19     A.   **No. Actually, I switched to liberal**
20   **arts and I'm still taking it now.**
21     Q.   Okay. Part-time?
22     A.   **Yes.**
23     Q.   So you've been enrolled there since
24   2008?
25     A.   **Uh-huh (affirmative response). And I**

90

1   **actually stopped in February of 2009 and**
2   **restarted in November of 2010 at Herzing. And**
3   **then I just switched back to Argosy in October.**
4     MR. MUSTIAN:
5       Why don't you just answer her
6   question instead of volunteering so much stuff,
7   okay?
8     THE WITNESS:
9       Okay.
10   EXAMINATION BY MS. MACDONALD:
11     Q.   Why did you stop in February of 2009?
12     A.   **I was tired.**
13     Q.   You were tired?
14     A.   **Uh-huh (affirmative response).**
15     Q.   Why?
16     A.   **I had a lot on my plate at the time.**
17     Q.   So the Monday after your accident the
18   doctors told you you could go back to work?
19     A.   **Yes.**
20     Q.   Did they tell you that you couldn't do
21   anything?
22     A.   **No.**
23     Q.   Okay. Did you go back to work?
24     A.   **No.**
25     Q.   Why not?

91

1     A.   **Well, I didn't go because I was still**
2   **having problems with my hand so I didn't go.**
3     Q.   Did you ever go back to Stein Mart?
4     A.   **One day.**
5     Q.   When?
6     A.   **I don't remember. Probably like a week**
7   **or so afterwards.**
8     Q.   Why only one day?
9     A.   **I didn't feel comfortable when I went**
10   **there.**
11     Q.   Why?
12     A.   **I got -- basically I felt like I was**
13   **getting harassed by the store manager for**
14   **falling.**
15     Q.   By Tim Bryant?
16     A.   **No, Steve, the manager, the store**
17   **manager.**
18     Q.   Why did you feel like you were being
19   harassed?
20     A.   **I kept getting questioned on what was**
21   **going on and what happened and stuff like that**
22   **and it was annoying.**
23     Q.   Did you work the whole day there?
24     A.   **Yes, I did.**
25     Q.   What kinds of things did you do that

92

1   day?
2     A.   **No, I just walked around the shoe**
3   **section.**
4     Q.   Picking stuff up putting it on the --
5     A.   **No, I just walked around the shoe**
6   **section.**
7     Q.   You just walked?
8     A.   **Uh-huh (affirmative response). I was**
9   **supposed to help customers if they came but**
10   **there was -- I just walked around the shoe**
11   **section.**
12     Q.   Do you remember anyone else who was at
13   work that day?
14     A.   **I don't remember the person's name but**
15   **I was working with someone. I wasn't there by**
16   **myself.**
17     Q.   Was it a man or woman?
18     A.   **It was a female.**
19     Q.   This was sometime probably in late
20   October of 2008?
21     A.   **Yeah.**
22     Q.   Do you remember any of the things that
23   Steve said to you?
24     A.   **It was just, you know, questions. I**
25   **didn't like it. I don't remember exactly what**

YOLANDA PEART                                                                JANUARY 19, 2011

93

1  he said but I know I was feeling uncomfortable.
2      Q.   So did you -- and then you didn't get
3  another job until February?
4      A.   Yes.
5      Q.   Did you try to get a job?
6      A.   Yes.
7      Q.   What sorts of places did you look?
8      A.   In hospitals.
9      Q.   Why didn't you get a job until
10  February?
11     A.   No one hired me.
12     Q.   That's kind of the beginning of the
13  recession, huh?
14     A.   Yeah.  No one hired me.
15     Q.   How was your arm and shoulder feeling
16  during that time?
17     A.   It still hurt but I was broke.
18     Q.   You needed the money?
19     A.   Uh-huh (affirmative response).
20         MR. MUSTIAN:
21             Please stop volunteering
22  information.  Please just answer the question.
23         THE WITNESS:
24             Okay.  I'm sorry.
25  EXAMINATION BY MS. MACDONALD:

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

94

1      Q.   Do you still have any -- just so I
2  understand, are those the only -- your back near
3  your shoulder blade, your neck, your left
4  shoulder and your left arm and hand are the only
5  injuries you have as a result of or had that you
6  claim you had as a result of your accident; is
7  that right?
8      A.   I have those injuries, yes.
9      Q.   And are any of those problems still
10  issues for you today?
11     A.   Yes.
12     Q.   What are your problems still today?
13     A.   I have neck pain.  I have shoulder
14  pains.  I have pains in my arm.
15     Q.   On a scale of 1 to 10 about how bad are
16  they on a daily basis?
17         MR. MUSTIAN:
18             Can we take them separately,
19  please, since they're different problems?
20         MS. MACDONALD:
21             Sure.
22         THE WITNESS:
23             Okay.  My neck pulls is more of a
24  problem.  It gives me more headache than I've
25  had before.  And I will give that about a 6.  My

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

95

1  shoulder, I will give that about a 5.  And my
2  arm pain, I would give that probably about a 5
3  as well.
4  EXAMINATION BY MS. MACDONALD:
5      Q.   Have you had any other accidents or
6  falls since that -- since your fall at Stein
7  Mart?
8      A.   No.
9      Q.   No?
10     A.   No.
11     Q.   Any car accidents or anything?
12     A.   No.
13     Q.   Any other injuries, you know, playing
14  with your kid, laser tag, whatever?
15     A.   No.
16     Q.   Do you think that that pain is getting
17  better?
18     A.   No.
19     Q.   Do the doctors think that you can do
20  anything else to make it better?
21     A.   No.
22     Q.   Do you take any medication for that
23  pain?
24     A.   Yes.
25     Q.   And what medications do you take?

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

96

1      A.   I usually take the Goody's headache
2  powder, Tramadol, and every once in a while
3  Flexeril, but that's basically it.
4      Q.   How often do you take medication for
5  your pain?
6      A.   I'm not big on medication so I only
7  take it when I absolutely have to.
8      Q.   Do you know about how often that is?
9      A.   Well, I take Goody's.  I probably take
10  that about three times a week.
11     Q.   Okay.
12     A.   The Flexeril, because it puts me to
13  sleep I don't really take that because I have to
14  work and I have school.
15     Q.   And is the Goody's headache powder over
16  the counter?
17     A.   Uh-huh (affirmative response).
18     Q.   Do you still do any physical therapy?
19     A.   No, I don't.
20     Q.   Do you do any kind of exercises at home
21  or anything?
22     A.   No, I don't.
23         MS. MACDONALD:
24             Would you please mark this as
25  Exhibit 2.

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

97

1          (Court reporter complies.)
2     EXAMINATION BY MS. MACDONALD:
3          Q.    Ms. Peart, I'd ask you to take a look
4     at what appears to be a medical record for you.
5     Was your name Bolden?
6          A.    **My name is Bolden, yeah.**
7          Q.    Was that your married name?
8          A.    **My maiden name.**
9          Q.    Your maiden name.  Okay.  Now if you
10    could look it says that the patient complained
11    of having pain in right shoulder --
12         A.    **Uh-huh (affirmative response).**
13         Q.    -- for two days.
14         A.    **Uh-huh (affirmative response).**
15         Q.    And then it says -- and then it
16    describes the problem you were having.  And then
17    do you see where under notes where it kind of
18    changes to a different handwriting there?
19         A.    **Notes?  Where?**
20         Q.    On the right side.
21         A.    **Here.  Okay.**
22         Q.    I think it says pain began reaching for
23    object across body?
24         A.    **Uh-huh (affirmative response).**
25         Q.    Is that what that say?

98

1          A.    **I don't know.  I don't know if that's**
2     **what they wrote.**
3          Q.    You don't know if that's what that says
4     there?
5          A.    **I can't really read this handwriting**
6     **too much.**
7          Q.    Do you remember seeing a doctor in May
8     of 2009 for right shoulder pain?
9          A.    **Yes.**
10         Q.    Do you know what caused your shoulder
11    pain?
12         A.    **No, I don't.**
13         Q.    You don't know.  Did you have any kind
14    of accident?
15         A.    **No.**
16         Q.    Do you remember reaching across your
17    body for something?
18         A.    **Yes, I do.**
19         Q.    What was that about?
20         A.    **I had to reach on -- I had a pen here,**
21    **and I had to reach over with my right shoulder**
22    **because I couldn't move my left shoulder and arm**
23    **at that time, so when I went to reach I heard a**
24    **pop.**
25         Q.    You heard a pop?

99

1          A.    **Uh-huh (affirmative response).**
2          Q.    And so did you go to the doctor when
3     you heard the pop?
4          A.    **I went to the doctor when it didn't get**
5     **better.**
6          Q.    So do you know about how long you
7     waited to see the doctor?
8          A.    **The next day.**
9          Q.    Did that cause you any other -- it says
10    your right shoulder you can't lift and you're
11    having trouble sleeping at night?
12         A.    **Uh-huh (affirmative response).**
13         Q.    Did it cause you any other kinds of
14    pain?
15         A.    **I didn't go to work.**
16         Q.    You didn't go to work?
17         A.    **No.**
18         Q.    Were you at work when you injured your
19    arm?
20         A.    **No.**
21         Q.    Does your right shoulder still hurt
22    you?
23         A.    **Sometimes it does.**
24         Q.    Do you take any medication for it?
25         A.    **I will use the same thing for my left**

100

1     shoulder.
2          Q.    Did that injury to your right shoulder
3     cause you to have any difficulty working?
4          A.    **Yes, it did.**
5          Q.    How did it cause you to have difficulty
6     working?
7          A.    **I already had the injury to my left**
8     **shoulder that I was having problems with.  And**
9     **so my right shoulder was hurting so it was kind**
10    **of hard for me to -- because my right**
11    **shoulder -- my right arm and shoulder was my**
12    **main source of use at the time.  So it basically**
13    **stopped me from working the few days until it**
14    **got better.**
15         Q.    Okay.  And then you said before that
16    you actually stopped working in June of 2009 for
17    a while?
18         A.    **Uh-huh (affirmative response).**
19         Q.    Is that because of your right shoulder?
20         A.    **No, from my left shoulder and my neck.**
21         Q.    What sort of -- did you do any kind of
22    lifting as a medical assistant, office assistant
23    during that time?
24         A.    **As a medical assistant the most that I**
25    **would lift is probably just helping a patient**

101

1   get onto a table.
2       Q.   So you weren't doing any kind of
3   overhead lifting?
4       A.   No.
5       Q.   You weren't lifting boxes of supplies
6   up to a shelf or anything?
7       A.   No.
8       Q.   So you really didn't have to raise your
9   arm above your head?
10      A.   Yeah.  And if anything was more moving
11  something, you know, it was on the side or
12  something like that.
13      Q.   But that wasn't the main part of your
14  job?
15      A.   No, that wasn't even a big part of my
16  job description, it was more patient care.
17      Q.   And are you right handed or left
18  handed?
19      A.   I'm right handed.
20      Q.   And have your -- you know, the injury
21  to your left shoulder in any way prevents you
22  from doing anything else around the house that
23  you need to do?
24      A.   I can't curl my hair because the
25  reaching above my head hurts.  I can't do that.

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

102

1   Anything that requires me to do a lot of stuff
2   that's, you know, where I'm reaching up that
3   hurts.  I can't -- I mean it's just anything
4   that -- anything that involves me lifting above
5   my head is a problem.
6       Q.   You're still able to walk and go
7   shopping with your grandma and aunt?
8       A.   Yes.
9       Q.   I'm just going to represent to you that
10  in your answers to your interrogatories you said
11  that you had about $20,000 in medical expenses
12  related to this injury, your left shoulder
13  injury; is that correct?
14      A.   I'm not sure.
15      MS. MACDONALD:
16          Do you want me to mark her
17  interrogatories as an exhibit?  Do you care?
18  Can I just show them to her?
19      MR. MUSTIAN:
20          I don't care.
21      MS. MACDONALD:
22          How would you like to do it?
23      MR. MUSTIAN:
24          I don't care.
25      EXAMINATION BY MS. MACDONALD:

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

103

1       Q.   Here.  I'm going to show you your
2   answer to interrogatories.
3       MS. MACDONALD:
4          Do you want to look at a copy?
5       MR. MUSTIAN:
6          Yeah.  Which answer is it?
7   EXAMINATION BY MS. MACDONALD:
8       Q.   We're going to turn to answer 12,
9   interrogatory 12.  Have you seen these
10  interrogatories before?
11      A.   This form I remember.  I remember
12  getting this in the mail.
13      Q.   With the answers in there?
14      A.   No, no answer.
15      Q.   Empty?
16      A.   It was empty.
17      Q.   And then what did you do?
18      A.   I filled in what I knew.
19      Q.   And sent it back to your lawyer?
20      A.   Uh-huh (affirmative response).
21      Q.   So then did you fill in the answer to
22  interrogatory 12 where it says $20,000 of
23  medical expenses?
24      A.   I don't remember filling that part out.
25      Q.   Do you have any idea about whether that

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

104

1   amount is correct?
2       A.   No, I don't.
3       Q.   And then it says general damages are
4   $200,000.  Do you know what that is?
5       A.   No, I don't.
6       Q.   Have you incurred any damages other
7   than medical expenses as a result of this
8   injury?
9       MR. MUSTIAN:
10          Are you asking her to characterize
11  damages?  I'm not sure what your asking.
12      MS. MACDONALD:
13          I'm just curious as to how we got
14  to 200,000.  That's what I'm trying to figure
15  out.
16      MR. MUSTIAN:
17          Well, that's her lawyer's job to do
18  that.
19      MS. MACDONALD:
20          Well, if she's had any other kind
21  of, you know, wage loss or other issues that are
22  monetary then I'm entitled to ask her about it.
23      MR. MUSTIAN:
24          You asked a very general question.
25      MS. MACDONALD:

PROGRESSIVE CERTIFIED COURT REPORTERS (504) 288-6843

105

1        Yeah.  I can ask the question I
2    want to ask.
3        MR. MUSTIAN:
4            Well, I understand that.
5    EXAMINATION BY MS. MACDONALD:
6        Q.    Ms. Peart, do you have any -- other
7    than medical bills do you have any idea of other
8    money damages that you're owed as a result of --
9    or you believe you're owed as a result of this
10   accident?
11       MR. MUSTIAN:
12           And I'm going to object to the form
13   of the question.  It asks her to characterize
14   damages which is a lawyer's job.  Answer it if
15   you can.
16       THE WITNESS:
17           I can't answer that question.
18   EXAMINATION BY MS. MACDONALD:
19       Q.    Do you believe that you haven't been
20   able to work at all as a result of your fall?
21       A.    **I've been able to work, yes.**
22       Q.    You have been able to work?
23       A.    **Yes.**
24       Q.    So you haven't missed out on any work
25   because of your fall?

106

1        A.    **I haven't -- no, not now.  No, I**
2    **haven't.**
3        Q.    So you're not claiming that you've lost
4    wages as a result of your fall?
5        A.    **I have lost wages as a result of the**
6    **fall.**
7        Q.    How?
8        A.    **When I was taken out of work because of**
9    **the pain.**
10       Q.    And when was that?
11       A.    **In June of '09.**
12       Q.    June of '09?
13       A.    **I mean of 2010.  I'm sorry.  No, no.**
14   **Of 2010 when I was taken out of work.  I'm**
15   **fibbing.  2009.**
16       Q.    2009?
17       A.    **Yeah, February.  Because after the temp**
18   **service, so '09.**
19       Q.    So in '09 --
20       A.    **I was taken out of work for a period of**
21   **time.**
22       Q.    And that was because of your left
23   shoulder problems?
24       A.    **Yes.**
25       Q.    And that period of time was July of

107

1    2009 till October of 2009?
2        A.    **Yes.**
3        Q.    Other than the period between July 2009
4    and October of 2009 was there any other time
5    when you were unable to work as a result of your
6    fall at Stein Mart?
7        A.    **From the October to when I started**
8    **working in February.**
9        Q.    That was a result of your fall or was
10   that a result of the fact that you couldn't find
11   a job?
12       A.    **I looked for a job and I wasn't able to**
13   **find a job.  But I still was having a lot of**
14   **pain at that time.**
15       Q.    Other than those two periods that
16   you've just described, October of 2008 until
17   February of 2009 and then July of 2009 through
18   October of 2009, is there any other time period
19   where you've not been able to work as a result
20   of your injuries?
21       A.    **No.**
22       Q.    Is there any other -- did you incur any
23   other losses that you're aware of, monetary
24   losses, as a result of your fall at Stein Mart?
25       A.    **I'm not sure.  What do you mean?**

108

1        Q.    Other than medical bills and then the
2    times that you've just described where you were
3    unable to work are there any other ways that you
4    think you've lost money as a result of your fall
5    at Stein Mart?
6        A.    **I'm not sure.  I don't think so, no.**
7        Q.    Is there any other reason you can think
8    of today that you're entitled to money from my
9    client as a result of your fall?
10       MR. MUSTIAN:
11           Object to the form.
12           Answer if you can.
13   EXAMINATION BY MS. MACDONALD:
14       Q.    You know, any other reason why out
15   there, whatever the reason?
16       A.    **That I would be entitled to money?**
17       Q.    Uh-huh (affirmative response).
18       A.    **I've suffered an injury.**
19       Q.    Your injury, the medical bills for your
20   injury?
21       A.    **Uh-huh (affirmative response).**
22       Q.    What prompted you to file this lawsuit?
23       MR. MUSTIAN:
24           Objection.  That calls for
25   privileged information, discussions with her

109

1 attorney.
2 EXAMINATION BY MS. MACDONALD:
3 **Q.** No, I'm not asking you about what you
4 talked about with your attorney. But why did
5 you go see your attorney in the first place?
6 MR. MUSTIAN:
7 No, she's not answering that.
8 MS. MACDONALD:
9 Can you explain why?
10 MR. MUSTIAN:
11 It's not reasonably calculated to
12 lead to discovery of admissible evidence and it
13 calls for privileged information.
14 MS. MACDONALD:
15 It's not privileged and it does
16 because I would like to know what prompted it if
17 anything.
18 MR. MUSTIAN:
19 It's not relevant to anything. It
20 doesn't matter.
21 MS. MACDONALD:
22 It goes to damages, goes to
23 injuries.
24 MR. MUSTIAN:
25 You've already asked her about her

110

1 injuries.
2 MS. MACDONALD:
3 I'm entitled to ask another
4 question.
5 EXAMINATION BY MS. MACDONALD:
6 **Q.** Can you think --
7 MR. MUSTIAN:
8 She's not going to answer the
9 question. You can ask it any way you want to.
10 If you feel strongly about it then file a
11 motion.
12 EXAMINATION BY MS. MACDONALD:
13 **Q.** When did you first go talk to a lawyer
14 about your lawsuit?
15 MR. MUSTIAN:
16 Don't answer. That's not relevant
17 to anything. Don't answer the question.
18 THE WITNESS:
19 Okay.
20 EXAMINATION BY MS. MACDONALD:
21 **Q.** Looking back at the interrogatory
22 answers that you have in front of you, I just
23 want to make sure, your answer to interrogatory
24 No. 5 you say that defendant is liable under the
25 Louisiana Products Liability Act based on

111

1 defective design by virtue of selection of
2 support rods of insufficient strength which have
3 a proclivity for wearing prematurely. Do you
4 have any knowledge about a defective design of
5 the step stool, Ms. Peart?
6 MR. MUSTIAN:
7 Objection, calls for expert
8 opinion.
9 Answer if you can.
10 THE WITNESS:
11 I can't answer that question.
12 EXAMINATION BY MS. MACDONALD:
13 **Q.** Do you believe that there's something
14 wrong with the step stool that caused you to
15 fall?
16 MR. MUSTIAN:
17 Objection to the form. Calls for
18 an expert opinion.
19 Answer if you can.
20 EXAMINATION BY MS. MACDONALD:
21 **Q.** It's just what your thoughts are.
22 **A.** **I do believe there was some fault to**
23 **it.**
24 **Q.** What was it?
25 **A.** **I'm not sure. I can't examine the**

112

1 **stepladder.**
2 **Q.** In your answer to interrogatory No. 14,
3 if you turn another couple of pages down, it
4 says that you provided an interview to the
5 Workers' Compensation insurer following the
6 accident.
7 **A.** **On 14?**
8 **Q.** The answer to 14, below.
9 **A.** **Yeah.**
10 **Q.** Do you remember that interview?
11 **A.** **Yes.**
12 **Q.** What did you discuss at that interview?
13 **A.** **I don't remember what we discussed. I**
14 **believe the actions that took place on that day**
15 **but I don't know exactly what else was**
16 **discussed.**
17 **Q.** Do you remember when you talked to the
18 insurer?
19 **A.** **No, I don't.**
20 **Q.** Do you remember who that person was?
21 **A.** **No, I don't.**
22 **Q.** Do you remember who the human resources
23 director at Stein Mart was?
24 **A.** **No, I don't.**
25 **Q.** But you remember talking with him or

113

1  her about your accident?
2       A.   I don't remember talking to anybody
3  from human resources.
4       Q.   Okay.
5            MS. MACDONALD:
6                 If I can just take a minute and
7  flip through my notes.  I'm almost done here.
8            (Off the record.)
9  EXAMINATION BY MS. MACDONALD:
10      Q.   Ms. Peart, you said before when you
11 were climbing onto the step stool you had purses
12 in your right arm?
13      A.   Left arm.
14      Q.   Left arm.  And you reached for the
15 handle with your right arm?
16      A.   Uh-huh (affirmative response).
17      Q.   Were you holding onto the handle at
18 that point?
19      A.   I don't remember if I was holding onto
20 it.
21      Q.   Did the step stool itself move at all
22 after you fell?
23      A.   I don't know.
24      Q.   Have you seen the step stool at any
25 time between today and the accident?

114

1       A.   Today and the accident, that's it.
2       Q.   That's it?
3       A.   Uh-huh (affirmative response).
4       Q.   Did anyone go with you to the hospital
5  from Stein Mart?
6       A.   No.
7       Q.   How did you get to the hospital?
8       A.   I had to drive there.
9       Q.   Ms. Peart, you mentioned before you had
10 a pinched nerve in your back while you were a
11 teenager.
12      A.   Uh-huh (affirmative response).
13      Q.   Have you had any similar problems since
14 then?
15      A.   No.
16      Q.   You've never had any kind of pinched
17 nerve issues?
18      A.   I haven't -- I haven't been told that I
19 have a pinched nerve in my back since then.
20           MS. MACDONALD:
21                I have no further questions.
22 EXAMINATION BY MR. MUSTIAN:
23      Q.   Just one question for you.  Have you
24 had pain as a result of your accident at Stein
25 Mart?

115

1       A.   Yes.
2            MR. MUSTIAN:
3                 Thanks.
4            (Conclusion of deposition at or about
5  1:30 p.m.)

116

1  W I T N E S S'   A T T E S T A T I O N
2            I have read or have had the foregoing
3  testimony read to me, pursuant to Rule 30(e) of
4  the Federal Rules of Civil Procedure and/or
5  Article 1445 of the Louisiana Code of Civil
6  Procedure, and hereby attest that, to the best
7  of my ability and understanding, it is a true
8  and correct transcription of my testimony, with
9  the exception of any attached corrections or
10 changes, complete with reasons for changes, on
11 the Witness' Amendment Pages;
12           I have in no way altered the printed
13 transcript pages containing testimony herein,
14 tampered with the seal on the last numbered page
15 herein, or tampered with the security strip on
16 the binder hereof.  The integrity of this
17 certified transcript has been maintained in the
18 identical form as it was received by me, with
19 the exception of any changes on the Witness'
20 Amendment Pages.
21
22      Signature _____
23           YOLANDA PEART
           _____
24           Date
25